## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| Integrated Recycling Group of SC, LLC | ) | Case No. __-_____- |
| | ) | |
| | ) | |
| Debtor. | ) | |

### DEBTOR'S EMERGENCY MOTION FOR THE USE OF CASH COLLATERAL

Integrated Recycling Group of SC, LLC, as debtor and debtor-in-possession in this case (hereinafter, the "Debtor"), hereby files this motion seeking entry of an order authorizing the use of cash collateral. The Debtor proposes to use the inventory and accounts receivable for payment of operating expenses which are absolutely necessary for the continuation of the Debtor's businesses. In support of this motion, Debtor submits the following:

### JURISDICTION

1. The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 11, 2011 (the "Petition Date"). The Debtor is a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2. This Court has subject matter jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court can exercise its subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1). Venue of these proceedings and the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND AND STATEMENT OF FACTS

3. Debtor operates a cotton and synthetic fiber reclamation and extrusion company based in Cowpens, South Carolina. The company takes cotton and synthetic waste product and recycles it into various materials that are ultimately used in automobile products, such as floor mats.

4. The company registered as a South Carolina limited liability company in 2005, with two brothers, Michael and Murphy Armstrong, as the sole owners. The Armstrong brothers (the "Armstrongs") continue to manage the company today.

5. The Armstrongs developed this business after working for their father for a number of years in his related textile business. Their father's company, Armstrong & Company of South Carolina

1

("Armstrong & Co."), focused on reclamation of cotton and was the largest supplier of reclaimed cotton to Spartan Mills from the mid-1980's until Spartan Mills filed bankruptcy in 2001.

6. In 2001, prior to the Spartan Mills bankruptcy, the Armstrongs and their father purchased a manufacturing facility in Cowpens, SC, which would allow the expansion from traditional cotton reclaiming into synthetic fiber reclamation and extrusion. The three of them purchased the building in the name of a new company called Armstrong-Cowpens, LLC ("Armstrong-Cowpens"), each owning a one-third interest.

7. Armstrong & Co. then moved its operations to the Cowpens facility, which it rented from Armstrong-Cowpens.

8. Shortly thereafter, Spartan Mills went into bankruptcy, and with the end of that era, the senior Armstrong decided to begin to phase out his business and allow his sons to carry on a business of their own.

9. For the next two to three years, the Armstrongs continued to operate Armstrong & Co. with an eye toward filling the customer void that the departure of Spartan Mills left and expanding further into synthetics. These were challenging years, in which sizeable debt was incurred by the Armstrongs individually along with their father, in order to grow the business ("pre-IRG Debt").

10. Around this same time, the Armstrongs attempted to join forces with a company out of Minnesota called Brotex, Inc. Although the union failed, the Armstrongs, in their individual capacity, were able to acquire an important piece of equipment for use in the business called a Pelletizer. The Pelletizer extrudes synthetic waste fiber back into pellets, which can then be sold into the fiber manufacturing and plastic injection molding markets. The Pelletizer was a necessary element for the expansion that the Armstrongs envisioned for the business.

11. In order for the Armstrongs to buy out the Brotex interest in the Pelletizer, they need to obtain financing. Their father mentioned their plight to a family friend, Al Bullington ("Bullington"), who decided to co-sign with the brothers for the financing, which was obtained through First National Bank of Spartanburg in April 2004 ("First National/Pelletizer Loan"). The First National/Pelletizer Loan included a security agreement for the Pelletizer.[1]

12. By this time in 2004, Armstrong & Co. had effectively ceased its operations. The Armstrongs created a new company called Integrated Recycling Group, Inc. with a third individual,

---

[1] Although the Pelletizer was owned by Murphy and Michael Armstrong, and they signed the security agreement, First National Bank inexplicably filed its UCC against only Michael Armstrong and against Armstrong & Co.

2

Alan Jackson. This new company was operating out of the Armstrong-Cowpens facility, paying rent to and leasing equipment from Armstrong-Cowpens, and leasing the Pelletizer from the Armstrongs.

13. This corporate entity was short-lived, however, because Mr. Jackson had other obligations and no longer wanted to participate. Around the same time, Bullington had become more familiar with the company and was interested in participating as a lender.

14. In September 2005, the Armstrongs signed Articles of Incorporation for a limited liability company known as Integrated Recycling Group of SC, LLC ("IRG" or "Debtor"), with the Armstrongs as the sole owners and managers.

15. In October 2005, Bullington arranged for financing for the new company through his company, ABB, Inc. ("ABB"). The terms of the loan from ABB to IRG included a $1,500,000 line of credit specifically earmarked to pay pre-IRG Debt along with cash flow for the new business. Security for the loan was a junior lien on a partial interest in real property in Montana owned by the Armstrongs' mother and uncle (the "Montana Property"). There was no other collateral for the loan.

16. On March 27, 2006, ABB filed a UCC against IRG on Accounts Receivable, Equipment, Furniture, Fixtures, Inventory, Instruments, Chattel Paper, and General Intangibles. IRG did not execute a security agreement, and this UCC was a unilateral filing by ABB.

17. The ABB loan was modified in June 2006 and again in February 2007. The modification in 2007 increased the credit line to $4,000,000 and added Bullington's family partnership, BFP, Inc. ("BFP") as an additional lender. The modification confirmed that the Montana Property was collateral for the loan, and there was no provision for additional collateral.

18. At this time, Bullington created a separate account, called the Armstrong Debt Reduction Account ("ADRA"), to be funded with the ABB loan proceeds for payment of pre-IRG Debt. Although it appears that the parties acknowledged that IRG would pay the pre-IRG Debt, such payments have been reported as income to the Armstrongs.

19. The ABB loan did not have a specific repayment schedule, but by its terms was to be repaid in five (5) years. Apparently Bullington had misgivings about the lack of specific payment terms, and decided to take matters into his own hands. He instructed his son, Bryan Bullington ("Bryan"), to take over the company.

20. In August 2007, Bryan opened a new IRG operating account for collection of receivables and threatened to shut the company down. IRG did not authorize the new bank account and did not authorize Bryan to take control of the company.

3

21. Shortly thereafter, Bullington instructed Bryan to stop all payment of pre-IRG Debt. IRG had been making direct payments on the Armstrongs' home mortgages (reported as income by the Armstrongs), and when these payments stopped, the Armstrongs were facing foreclosure actions on their homes. The other pre-IRG Debt was also going into default.

22. On October 22, 2007, Bullington demanded that IRG sign titles of ownership over to ABB on all of the equipment owned by IRG. These titles of ownership were signed over by IRG under duress. There was no consideration for these transfers.

23. By 2008, Byran was telling the IRG employees that they worked for him, and he told Michael Armstrong that ABB and the Bullingtons owned IRG.

24. In May 2008, ABB purchased the First National/Pelletizer Loan. Prior to this purchase, IRG was making monthly payments of $5200 on the First National/Pelletizer Loan as its lease payment to the Armstrongs for use of the Pelletizer. When ABB purchased the note, these lease payments by IRG stopped, and the Debtor has not made additional lease payments to the Armstrongs for use of this equipment since.

25. With help from legal counsel, the Armstrongs finally regained control of the IRG operating account and the company in the Fall of 2008. IRG attempted in vain to resolve the issues with ABB and Bullington. Negotiations continued throughout the next year, and IRG rejected attempts by Bullington for a stock takeover in November 2009.

26. In November 2010 Bryan once again threatened to shut the company down. Despite the deterioration of the relationship with the Bullingtons, IRG has continued efforts towards a resolution.

27. On March 16, 2011, ABB and BFP filed a complaint against IRG and the Armstrongs in state court. ABB is seeking immediate claim and delivery of the Pelletizer, on which it claims to have a perfected security interest via its purchase of the First National/Pelletizer Loan. The Pelletizer, which IRG leases from the Armstrongs, is critical to the operations of the Debtor, and this action by ABB has made this Chapter 11 necessary.

28. Although ABB may consider itself a secured creditor of the estate, the UCC it filed unilaterally is invalid. The only creditors who have a lien against cash collateral are the Internal Revenue Service ("IRS"), the South Carolina Department of Revenue ("SCDOR"), the South Carolina Department of Employment and Workforce ("SCDEW"), and Arthur State Bank (together "Secured Creditors").

29. As of the Petition Date, the IRS claims to be owed $193,896.10. The IRS's claim arises from tax liens filed against the Debtor in Spartanburg County, South Carolina for 941 taxes for the years 2009 and 2010.

30. As of the Petition Date, the SCDOR claims to be owed $57,623.27. The SCDOR's claim arises from tax liens filed against the Debtor in Spartanburg County, South Carolina for employer withholding taxes for the years 2008, 2009 and 2010.

31. As of the Petition Date, the SCDEW claims to be owed $1,077.19. The SCDEW's claim arises from tax liens filed against the Debtor in Spartanburg County, South Carolina for employment taxes for the year 2009.

32. Arthur State Bank has a lien on a specific bank account in the amount of $58,358.81. This claim arises from a loan to the Debtor secured by a first lien on the Debtor's account at Arthur State Bank ending in 1183.

### RELIEF REQUESTED

The Debtor is unable to operate its business and to pay critical operating expenses without the ability to use Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code). The Debtor will suffer immediate and irreparable harm if the relief herein is not granted.

The valid secured interests subject to the proposed use of cash collateral are as follows:

| | |
|---|---|
| IRS | $193,896.10 |
| SCDOR | $ 57,623.27 |
| SCDEW | $ 1,077.19 |
| Arthur State Bank | $ 58,358.81 |
| **TOTAL** | **$310,955.37** |

Schedule B shows unencumbered assets of the Debtor in the amount of approximately $1,180,000. Since the Secured Creditors are secured by less than $311,000, it is clear that the Secured Creditors are adequately protected if the Debtor is permitted to use Cash Collateral. The Secured Creditors have an equity cushion over and above the value of the collateral securing their claims. In addition, in the event that one or more Secured Creditors are determined to have a valid lien on cash collateral, Debtor agrees to provide such Secured Creditor(s) a replacement lien on post-petition cash collateral in the same validity and priority as its pre-petition lien, to the extent of any diminution in its cash collateral post petition. As evidenced by **Exhibit A**, the amount available as ongoing cash collateral increases as the case proceeds.

5

The Debtor requests authorization to use Cash Collateral in accordance with budget which is attached hereto as **Exhibit A**, under the conditions herein. Debtor also requests permission to exceed line items as long as it does not exceed the overall amount requested in the budget.

The Debtor's use of cash collateral in this case is absolutely necessary for the continued operation of the Debtor's business. In order to generate continuing accounts receivable, the Debtor must have the resources to continue in business. Debtor needs to pay its operational expenses, such as payroll, utilities, insurance, and necessary raw materials as listed in the projections attached as **Exhibit A**.

Section §363(c)(2) of the Bankruptcy Code provides that the Debtor may use cash collateral if each entity that has an interest in such cash collateral consents or if the Court authorizes such use after notice and hearing. Notwithstanding the objection of a party with an interest in the cash collateral, pursuant to §363(e), the Court may authorize the use of cash collateral if such creditor is provided with adequate protection for its interest in the collateral.

When the secured creditor's interest in the collateral is adequately protected, the policy and provisions of the Bankruptcy Code mandate the authorization for use of the collateral. See Metropolitan Life Insurance Co. v. Sunnymead Shopping Center Co. (*In re* Sunnymead Shopping Center Co.), 178 B.R. 809 (Bankr. App. Panel 9th Cir. 1995); MB Bank Dallas, N.A. v. O'Connor (*In re* O'Connor), 808 F.2d 1393 (10th Cir. 1987); Chrysler Credit Corp. v. Ruggiere (*In re* George Ruggiere Chrysler Plymouth, Inc.), 727 F.2d 1017 (11th Cir. 1984); see also *In re* JKJ Chevrolet, Inc., 190 B.R. 542, 545 (Bankr. E.D. Va. 1995), aff'd in unpublished opinion, 117 F.3d 1413, (4th Cir. 1997) (citing *In re* O'Connor).

Use of cash collateral is necessary in order to allow a successful reorganization, based upon the continuing operation of the Debtor's business. This will benefit all parties, including the Secured Creditors which will receive a replacement lien as described above.

The relief is requested on an interim basis, until a final hearing on the Motion is heard before this Court with appropriate notice to parties in interest, as may be ordered by the Court.

WHEREFORE, having shown that it is entitled to the continuing use of cash collateral for its ongoing operations, the Debtor requests an Order authorizing such use, a hearing date in order to have this matter resolved as quickly as possible, and such other and further relief as the Court may deem appropriate.

RESPECTFULLY SUBMITTED on this the 11th day of May, 2011 at Columbia, South Carolina.

BARTON LAW FIRM, P.A.

BY: /s/Barbara George Barton
Barbara George Barton, #1221
Christine E. Brimm, #6313
BARTON LAW FIRM, P.A.
Proposed Attorney for the Debtor
1715 Pickens Street
P. O. Box 12046
Columbia, SC 29211-2046
(803) 256-6582
Email: bbarton@bartonlawsc.com